## SOUTHERN RAILWAY COMPANY *v.* SKINNER.

1. It is error for the court to instruct the jury that a common carrier is under the duty to furnish a safe place for passengers to alight and such place as it is able to furnish.
2. Where a passenger was carried by a railroad company to the station to which he had a ticket, and he remained on the train for the purpose of going beyond such station to a place on the road at which such train stopped to allow passengers to disembark, to which place he had no ticket, *held:* (*a*) Whether he sustained the relation of passenger after the train left such station did not depend upon the knowledge of the conductor that he was on the train after it left such station, or whether the conductor could have discovered his presence on the train by the exercise of extraordinary care. (*b*) If such person remained on the train after it left the station to which he had a ticket, with a bona fide intention and present ability to pay cash fare to the place to which he intended going, he sustained to the carrier the relation of passenger while thus on the train, and the carrier owed him the duty due by it to a passenger; but if he remained on such train without such ability and intention, he did not sustain such relation, but·was a trespasser, and the carrier only owed him the duty due to a trespasser.

Argued February 5,—Decided June 30,'1909.

Action for damages. Before Judge Edwards. Douglas superior court. July 13, 1908.

*Maddox, McCamy & Shumate,* for plaintiff in error.

*J. D. Kilpatrick* and *J. S. James,* contra.

HOLDEN, J. The defendant in error brought suit against the plaintiff in error for damages, making the following allegations: "That petitioner lives about one mile from the court-house ·in the town of Douglasville, Ga., and that on the 13th day of October, 1905, petitioner boarded what was then known and called the accommodation train in Atlanta, Ga., leaving the terminal station at 6:15 p. m. He had purchased a ticket to Douglasville, Ga., and when he reached Douglasville he paid the conductor in charge of said train ten cents to ride to a point near one mile west of the depot in said town of Douglasville. This was known and called West End, where he expected to alight and where he was entitled to be delivered by said train. The conductor said to petitioner that he would stop the car that evening at the road crossing known as West End, and just as the crossing was reached the conductor called out all off for West End. Petitioner followed the conductor to the front end of the car after the conductor had so announced and was carried to a point 100 or 150 yards

west of the place known as West End Crossing. The car barely stopped. It was very dark at the time, something after 7 o'clock. Petitioner attempted to get off of the train, but thought he was at the crossing. Just as he stepped off of the car, the train gave a sudden jerk; there was no light at the place; the conductor passed on through the car just before petitioner went out of the car and went on into the front car. It was so dark that petitioner could not see and he thought he was right on the crossing, and, in place of being on the crossing, he was carried west of it, and as he went to alight from the car he was thrown therefrom into and against a lot of cross ties. . . He charges and alleges that the injuries he received were caused without any negligence or fault on his part, but wholly and entirely on account of the gross negligence and carelessness of said conductor." He further alleged that by reason of being thrown against the cross ties he was seriously injured by having the vision of one of his eyes affected and receiving injuries in other ways. Upon the trial of the case the plaintiff testified, among other things, that he boarded what is known as the accommodation train on defendant's road in Atlanta, with a ticket from Atlanta to Douglasville. This train stops at West End, a point beyond Douglasville. When he got to Douglasville, he told the conductor he wanted to go to West End, and paid his fare thereto. When the train reached West End, the conductor announced that fact and told the plaintiff to get off, and said to plaintiff, "You get off. You are the only man to get off." He went to the steps, thinking he was on the crossing. It was dark. As he went to get off the train, it jerked and threw him "headforemost in the cross ties." This occurred 65 to 75 yards beyond the crossing. The plaintiff and another witness also testified to the character and extent of his injuries. The conductor testified, among other things, the following: He had some passengers for West End, and stopped at the crossing to let them off. Three or four passengers got off the train. The train stayed there a minute and a half. He signaled the train forward. The plaintiff paid no fare beyond Douglasville. He did not see the plaintiff after the train left Douglasville. There was much other testimony for plaintiff and defendant, but it is unnecessary to set out the same. The jury found

in favor of the plaintiff, and the defendant company excepted to the overruling of its motion for a new trial.

1. One ground of the amended motion for a new trial is as follows: "Because, as movant insists, the court erred in the following charge: 'Gentlemen of the jury, you look to the facts in this case, if you find that the plaintiff was a passenger, and determine what degree of diligence and care the railway company exercised toward the plaintiff in landing him at West End crossing. It was the duty, if he was a passenger for this place, for the railway company to stop the train at this place a sufficient length of time to enable him to disembark from the car and onto the landing with safety. It was also the duty of the company to use this extraordinary degree of diligence and care to see that he was not injured, and to see that no movement of the train was made which would throw him from the cars and injure him. At crossings of this kind, stops of an accommodation train, the landing ought to be such as are—the company is unable [able?] to furnish; that is, the company would not be permitted to allow a person to land at a dangerous place. It must be taken into consideration all the facts and circumstances, the fact that it is an accommodation train, that it stops at places other than stations; you determine from the facts and circumstances whether or not they furnish a safe place to land, and stop a sufficient length of time to enable him to alight." The court probably used the word "able" instead of "unable," as appears in the above-quoted charge. However, if there is no error in the copy of this part of the charge appearing in the record and the court did use the word "unable," it was evidently a lapsus linguæ, and the jury probably understood the court to mean "able" instead of "unable," as the sentence in which "unable" is used would be meaningless if the word "unable" was used where it appears in the above-quoted charge to have been used and is given its real meaning. Besides, the context shows that the court either used, or intended to use, the word "able" instead of the word "unable." The above-quoted charge made the railroad company an insurer of the safety of the place at which it landed its passengers. In no instance does the duty of a railway company, in protecting the lives and persons of its passengers or others, make it an insurer of their safety. The charge might be construed to mean that the company was under the

duty to exercise extraordinary diligence in the movement of the train while the plaintiff was in the act of alighting, but the court did not instruct the jury that the company was under the duty of exercising any specified degree of care in furnishing a place for the plaintiff to land; and the charge was such that the jury must have understood it to mean that the company was under the duty to "furnish a safe place to land" and such place as it was *able* to furnish.

2. Another portion of the charge excepted to is as follows: "A passenger is any person who enters the railroad car set apart for the carriage of passengers from one place to another, whether he buys a ticket or pays his fare, if he so enters with the consent of the railway company. In this case, gentlemen of the jury, I charge you that in order to make a person a passenger from Douglasville to West End Crossing, it must appear that the railway company had knowledge of his presence on the car and of his intention to take passage from Douglasville to West End Crossing. This knowledge might be implied from all the circumstances of the case; if the conductor, by the exercise of ordinary diligence—extraordinary diligence on his part, could have discovered that the passenger was taking passage from Douglasville to West End Crossing, and in the exercise of this degree of diligence could have known of it, then in law he would be a passenger and entitled to all the rights and protection that the law gives to a passenger on the railroad train. If, however, in this passage of one mile or thereabouts, from Douglasville to West End Crossing, under the circumstances in this case, considering all the surrounding circumstances, the conductor did not know of his presence, did not know of his intention to get off at West End Crossing, and could not by the exercise of extraordinary diligence have discovered it, then he would not be a passenger with the right to have the train stop and safely land him on this crossing. That is an issue of fact which you will determine." The difficulty with this charge is that it mingled two separate things, and was calculated to mislead and confuse the jury. On this branch of the case two points arise: First, was or was not the plaintiff a passenger on the defendant's train? Second, if he was a passenger, did the defendant and its agents exercise due care in regard to him? If the plaintiff not only purchased and delivered to the

conductor a ticket from Atlanta to Douglasville, but, desiring to go to a stopping-place beyond the latter point, paid his fare for transportation to such second point and remained on the train for that purpose, he was of course a passenger. If he purchased a ticket to Douglasville and delivered it up, and it had appeared from the evidence that, determining that he wished to go on beyond that point, he remained on the train to be so transported, with the present ability and bona fide intent to pay his fare in the usual and ordinary way in which it was paid on trains of the character of that on which he was riding, he would be a passenger. If he bought a ticket to Douglasville, paid his fare only to that point, and remained on the train for the purpose of riding the additional mile beyond Douglasville to the point where he really desired to alight without the payment of fare, he would not in law be a passenger after leaving Douglasville, but a trespasser. The diligence or lack of diligence of the conductor in discovering him was not the test of whether he was a passenger. If he was not a passenger beyond Douglasville, in the legal sense of the word, he was not entitled to claim that the defendant or its agents owed him that measure of care which is due to a passenger, but only such as is due to a trespasser on its train. If he was a passenger, then he was entitled to the measure of care due to him as such. The charge now under discussion does not directly involve a statement of whether, relatively to the preparing of proper places at stations or stopping-places for passengers to alight, the measure of care due is ordinary or extraordinary. It does make it the duty of the conductor or agent in charge of a train, in regard to a passenger thereon, to use extraordinary care; and this is correct. But the charge commingled the question whether the plaintiff was a passenger, and as such entitled to the measure of care due to a passenger, with the other question as to whether, if he was a passenger, the proper measure of care was exercised toward him; and it made the existence of the relation of carrier and passenger turn upon the use of extraordinary diligence on the part of the conductor to discover him on the train. If he was a mere trespasser riding on the train, the conductor owed him no duty to discover him and ascertain where he might wish to alight. The charge erroneously stated the law, and necessitates a reversal.

As there must be a new trial, we would add that if it should be determined that the plaintiff was a passenger, and therefore that the defendant's agents in charge of and operating its train owed him the duty of extraordinary care, in determining what such care required the conductor to do as to ascertaining the intended stopping-point of the plaintiff, and the agents to do as to furnishing reasonable time and opportunity to alight there, all of the circumstances disclosed by the evidence should be considered, including among them the nature and character of the train, the shortness of the distance to the intended stopping-point, what the conductor did or failed to do, whether or not the plaintiff informed the conductor of his intention to go beyond Douglasville, or whether he placed the conductor off his guard by surrendering a ticket to Douglasville as his destination, without any intimation or effort to inform the conductor of a desire to proceed to a point about a mile farther. And, similarly, in considering whether the plaintiff himself was wanting in the use of ordinary care under the circumstances, and whether by the use of such ordinary care he could have avoided the results of the defendant's negligence, if it was negligent, the facts disclosed by the evidence should be considered. The evidence as to the questions of fact was conflicting, but the judge should have submitted the case in the light of that fact.

As to the three remaining assignments of error in the amendment to the motion for a new trial, two of them are not referred to in the brief of counsel for the plaintiff in error, and will be treated as abandoned; and the other one it is unnecessary to deal with, since it relates to a matter not likely to occur on another trial.          *Judgment reversed.   All the Justices concur.*